George ALPERT, Petitioner-Appellant,

v.

The NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY, Debtor.

No. 399, Docket 29443.

United States Court of Appeals Second Circuit.

Argued May 4, 1965.

Decided July 1, 1965.

Bethuel M. Webster, New York City (Donald J. Cohn, New York City, and Lewis E. Caplan, New Haven, Conn., on the brief), for petitioner-appellant.

William L. Hadden, New Haven, Conn. (James Wm. Moore, Joseph W. Bishop, Jr., Robert W. Blanchette, New Haven, Conn., on the brief), for debtor-appellee.

Before MOORE, SMITH and HAYS, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge.

George Alpert, Chief Executive Officer of the New York, New Haven and Hartford Railroad (New Haven) from 1956 to 1961, moved in the reorganization proceedings of the New Haven for an order directing the New Haven's Trustees to pay him as a preferred claim $295,833.24 allegedly due under an employment contract dating back to May 9, 1956. In that contract, Alpert, a successful Boston attorney with no prior railroad experience, was employed for the period June 1, 1956 to May 31, 1961 as the railroad's Chief Executive at an annual salary of $60,000. The agreement further provided that he would receive $25,000 annually for a period of twelve years following the expiration of his employment in 1961 "by way of severance pay and as deferred compensation for the services performed and to be performed by him hereunder." At a special meeting of stockholders called for July 25, 1956, the stockholders were asked to approve, and did approve, the employment contract; the proxy solicitation statement, however, advised them that their approval was not necessary since the agreement was binding on the company in any case.[1] After the New Haven took refuge in the bankruptcy court in 1961 and following the appointment of Trustees, on August 21, 1961 the District Court, at the request of the Trustees, issued Order No. 12 which authorized and directed the Trustees to continue making pension payments to those receiving payments under the company's pension systems and to all others thereafter eligible under those plans, but which specifically directed that such payments were not to be made pursuant to the individual contracts with Alpert, Howard S. Palmer, William K. Tate and Samuel J. Massey, Jr. The Trustees then disaffirmed the separate retirement or other compensation provisions under the four contracts.

The District Court, Robert P. Anderson, Circuit Judge, sitting by designation, denied Alpert's claim holding that the retirement provision was not a part of the New Haven's regular pension program and that the employment contract was void from its inception since Alpert was hired as Chief Executive in contravention of the corporate by-laws which made no provision for bifurcation of the top administrative office, providing only for a President who also was to serve as the chief executive officer. The court further found that the contract's infirmity was neither waived by the vote of the stockholders nor cured by Alpert's performance under the contract for the full five year term since the stockholders were falsely advised that they had no powers under the by-laws to disapprove the employment contract and since Alpert, aware himself of the falsity of these statements was moreover adequately compensated for his services. Tate v. New York, New Haven and Hart-

---

[1] The proxy solicitation provided in part as follows:

"2. To approve the execution on May 11, 1956 of an employment contract between the Company and Mr. George Alpert, its President.

\*　　\*　　\*　　\*　　\*

"Prior to the approval of the contract by your Board of Directors, Counsel for the Company advised the Board that in his opinion the employment and terms of employment of a Chief Executive Officer of the Company was a matter exclusively within the province of the Board. Thus the contract became and continues to be binding both upon the Company and upon Mr. Alpert, whether or not approved by the stockholders."

ford Railroad Co., 332 F.2d 449 (2 Cir. 1964), where this court authorized reconsideration of a pension claim by Tate, whose pension agreement had been rejected in Order No. 12, was distinguished by the court on the ground that the equitable considerations supporting Tate's claim were not present here.

■■■ The District Court properly distinguished the Tate decision and correctly denied Alpert's claim for preferred treatment. In affirming the denial of Alpert's petition, however, we reject his claim, not because the agreement was defective or illegal—we find it unnecessary to reach this question—but simply because payments of this kind under the circumstances in which they were provided for cannot be construed as being the equivalent of or as a substitute for regular railroad company pension payments. The contracted for compensation was precisely what it was labeled to be—deferred compensation, and as such the claim for this sum is entitled to no preference under any section of the Bankruptcy Act. Alpert's claim is a nonpreferential ordinary contract claim, and the only way in which he may hope to recover is as a general creditor.

Alpert draws a very bright picture of the services he performed and the self-sacrifices he made in behalf of the New Haven when he assumed the Chief Executive's position in 1956 and during his term of office. He points out that he left a lucrative Boston law practice to take on a difficult job that offered a salary of $30,000 less than had been paid to preceding New Haven presidents, that he saved the New Haven a minimum of $62,000 by serving as president of two subsidiary companies without receiving the additional compensation paid to former presidents, and that he was instrumental in delaying the claims of preferred stockholders and in securing additional financing for the beleaguered company. He argues, in attempting to put himself in the same posture as Tate, that to deny him a pension "would be the rankest kind of discrimination" and "would disrupt morale and impair recruitment." It would be discriminatory, he contends, to permit payments to two of the executives named in Order No. 12, Tate and Howard Palmer,[2] and at the same time to refuse to make the payments to him when all four of them were employed under individual contracts and in executive capacities; and it would impair recruitment because a candidate for employment with the railroad would be adversely influenced by the fact that a former president had been denied a pension even though he was granted one by the Board to induce him to take the job.

Alpert's comparison to Tate is lacking in merit. There are several important distinguishing features between his contract with the company and Tate's which make it clear that the payments to Alpert were intended to be deferred compensation payments and nothing more. Alpert's retirement compensation was peculiar to himself in that it bore no relation to the New Haven's pension plans, was subject to no conditions respecting either age or length of service, was limited to the twelve year period and did not terminate upon his death, and was never referred to in the contract as a "pension." Moreover, the sum total of the payments is far in excess of the maximum permissible pension that could have been paid to Alpert for the twelve year period under the New Haven's regular pension plan. Tate's retirement compensation, which the court was authorized to grant, on the other hand, although his claim was based on a separate contract, was no different from what he would have received without the contract. According to his contract, it was to be computed according to the formula specified in the company's pension plan, was subject to reduction by the amount paid to him under the Railroad Retirement Act in accordance with article 1(a) of the pension system, as in the case of the usual pension terminated upon his

2. Palmer's claim for a pension was settled by the Trustees, and he is now receiving one.

death and not before, and was specifically designated as a "pension" in the agreement. Consideration of Tate's long service on other railroads prior to coming to the New Haven was customary in the industry. The order of this court did not require that pension be paid according to the contract, in any event, but held that existence of the contract did not bar payment of such a pension to Tate as might be found equitable.

The presence of these factors in Tate's contract prompted us to conclude that Tate's compensation, consistent with the preamble of the retirement plan, was intended solely to raise to a decent level his total retirement income, and that it would be inequitable to pay the other pensioners and not to make some pension provision for Tate. Order No. 12 was intended to maintain the loyalty and incentive of present employees and to facilitate the recruitment of new employees—the reorganization court was otherwise under no statutory or other duty to prefer these pension payments—and we considered that taking into account the particular situation of Tate would achieve a similar purpose. That would hardly be true, however, if we were to grant Alpert's petition; the refusal to confer a preference upon Alpert's contractual claim for nearly $300,-000 is unlikely to impede the recruitment of future employees.

Alpert's claim, therefore, is merely one for deferred compensation and as such is entitled to no preference in bankruptcy. Although Alpert performed his services for the New Haven prior to the railroad's entry into the reorganization court, and his claim to the payments did not accrue until after the reorganization proceedings were commenced, the payments cannot qualify as part of the debtor's operating expenses. Alpert has merely an executory contract with the railroad and must wait his turn as a general creditor. See 4 Collier on Bankruptcy ¶ 70.43, pp. 1350–1351. It is true that a priority has been extended by some reorganization courts to claims for wages earned within a fairly short time prior to the filing of the petition (the "six-months rule"), see In re Third Avenue Transit Corp., D.C., 138 F.Supp. 623, 626 (1955), aff'd 230 F.2d 425 (2 Cir. 1956), but we see no reason to expand the rule to grant it to a top executive of the insolvent railroad on a claim for deferred compensation payable after insolvency.

The denial of Alpert's petition is affirmed.